Argued December 7; affirmed December 28, 1938; rehearing denied
January 31, 1939

# CRASWELL ET AL. *v.* BIGGS ET AL.

(86 P. (2d) 71)

548

*James L. Conley*, of Portland (W. L. Cooper, of Portland, on the brief), for appellants.

*Frank S. Senn*, of Portland (Senn & Recken, of Portland, on the brief), for respondents.

BEAN, C. J.  This is an action upon a bond given to secure the faithful performance of a contract for work on a portion of a road and for the prompt payment of all laborers, mechanics and subcontractors and materialmen.  The cause was tried by the court without the intervention of a jury.  Findings of fact were made and a judgment was rendered in favor of plaintiffs and against the defendants Biggs and Hallyburton and in favor of the Aetna Casualty & Surety Company, a corporation, from which judgment the plaintiffs appeal.

The facts in regard to the case are about as follows: On May 12, 1931, plaintiffs L. E. Craswell, O. G. McIntyre and James Borin, members of a copartnership doing business under the firm name and style of Portland Sand & Gravel Company, entered into a contract with the State of Oregon, through the Oregon State Highway Commission, for the construction of the east unit of the Umatilla-Sand Station Section of the Columbia River Highway, 'in Umatilla county, Oregon, giving the usual statutory bond guaranteeing the completion of the construction work and the prompt payment of all claims for labor and material entering into same.  This bond was signed by themselves as principals and the Southern Surety Company as surety.

On the same day plaintiffs entered into a subcontract with J. M. Biggs•and J. E. Hallyburton for the

completion of a portion of said construction work, copy of which subcontract was attached to the complaint as an exhibit. Briefly, it provided for the clearing of the right of way of the entire East Unit, and for the excavation and grading of said unit from Station 350.50 to 552.50. Aside from the clearing, the work was to be done on a unit basis; that is to say, so much per cubic yard for common excavation, and so much per cubic yard for rock excavation. The work so sublet was at the time estimated at $18,337. This work actually over-ran several thousand dollars and totaled about $23,000 when completed. This subcontract provided that Biggs and Hallyburton were to furnish a surety bond to plaintiffs in the sum of $15,000, guaranteeing the performance of the work and payment for labor and materials. Such bond was furnished by Biggs and Hallyburton, signed by themselves and by the defendant Aetna Casualty & Surety Company, copy of which is found in the record, and was dated May 14, 1931.

At the time said contract was entered into Biggs and Hallyburton wanted a larger portion of the work embraced in the principal contract, but because of the limited showing in their financial statement, Mr. Lively, resident vice-president of the Aetna Casualty & Surety Company, and a member of the general agency of Bates, Lively & Pearson, refused to bond them for more work at the time.

After the delivery of said bond, on May 29, 1931, the plaintiffs made and entered into a further contract with Biggs and Hallyburton, as follows:

"As a continuation of that certain contract between the Portland Sand and Gravel Co. of Portland, Oregon and Biggs and Hallyburton of Hermiston, Oregon, entered into the 12th day of May, 1931, at Portland, Oregon, it is further agreed between the parties hereto

that Biggs and Hallyburton agree to subcontract the balance of the East Unit of the Umatilla-Sand Station on the Columbia River Highway in Umatilla County, Oregon, as provided in the above referred contract and being from station 522.50 to 631 for the prices referred to. In addition to the specified amounts of work referred to the following is included at and for the prices below:

"The laying of all the corrugated pipes used on the unit at the price of 25c per lineal foot plus excavation cost of 17½c per yard.

"The digging and gravel topping of the entire unit at the following prices: digging approximately 22,000 yards at 28c per cubic yard; hauling approximately 22,000 yards at 17c per yard mile, split on the half mile, plus grading.

"All excavation that will be required on the Cold Springs road at prices common or rock prices."

The plaintiffs claim that Mr. Lively told them that if the work progressed satisfactorily they might later take additional work on the job and that he would then bond them for such additional work. All of the first portion of the work was done with teams, and progressed satisfactorily. In the latter part of May, Biggs and Hallyburton asked for additional work. They were told by plaintiffs that they could have it if their surety would bond such work. About the 26th or 27th of May, Mr. McIntyre, who was in charge of the job for plaintiffs, came to Portland, and, together with his partners, called on Mr. Lively and explained that Biggs and Hallyburton had made good progress with their work and wanted to take over the greater portion of the remainder of the job. The matter was discussed and plaintiffs desired to know if Mr. Lively would bond Biggs and Hallyburton for the additional work. It is the claim of the plaintiffs that Lively told them:

"it was not necessary to write a new bond covering such additional work, as the bond already in existence

would cover such work. He also stated that an additional premium would be charged Biggs & Hallyburton for this extra work. He instructed the appellants to furnish him with a copy of the supplemental contract as soon as it was executed.''

Soon afterwards McIntyre returned to the job, and the following day his partners, Craswell and Borin, went to Umatilla county and the three of them then discussed the matter further with Biggs and Hallyburton and entered into the supplemental agreement which we have quoted above. This supplemental agreement covered nearly all of the balance of the work in plaintiffs' original contract with the State and was estimated at about $28,000, in addition to the work contained in the first subcontract.

The defendant company denied that Lively told the parties that the bond would be extended so as to cover the additional work and denied liability on the bond for the work embraced in the second subcontract for the reason that Lively was not authorized to extend the bond to cover such additional work and for the reason that the agreement was not in writing.

The trial court found, and there was testimony to support the finding, as follows:

''That before entering into said agreement of May 29, 1931, with the defendants Biggs and Hallyburton, the plaintiffs submitted the request of Biggs & Hallyburton for said additional work to Karl V. Lively and asked said Karl V. Lively whether or not the defendant Aetna Casualty & Surety Company would bond said defendants Biggs & Hallyburton for such additional work. That said Karl V. Lively then and there told the plaintiffs that it was not necessary to execute a new bond covering said additional work, but that said additional work would be covered by the bond already in effect, to-wit, the said bond dated May the 14th, 1931.

That said Lively further advised plaintiffs that an additional premium would have to be paid by the defendants Biggs & Hallyburton based upon the amount of work covered by said agreement of May 12th and said agreement of May 29th, 1931. That said statements of said Lively were oral and were not reduced to writing. That plaintiffs relied upon said statements of said Karl V. Lively, believed them to be true, and because thereof entered into said agreement of May 29th, 1931, with Biggs & Hallyburton.

"The court further finds there is no evidence that Mr. Lively had any real or apparent authority to enter into this oral understanding. There is no evidence that Mr. Lively ever did any similar act which was acquiesced in by the insurance company. The court finds that the insurance company is not bound unless Lively had either actual or apparent authority to make the same, and the court finds that the evidence does not show that Lively had either actual or apparent authority to make such statements, and that when Lively made such statements he was not acting within the scope of his authority, either real or apparent, and that the statements of said Lively were oral and not in writing."

Biggs and Hallyburton defaulted in the performance of their contract and on account thereof the plaintiffs were required to pay over $14,000.

The first assignment of error is that the court erred in holding that Karl V. Lively had no real or apparent authority to extend the coverage of the bond to the additional work covered by the supplemental agreement. It appears that at the time Mr. McIntyre spoke to Mr. Lively about coverage for the second or supplemental contract it was not known by any of the plaintiffs that an additional subcontract would be awarded to Biggs and Hallyburton. Instead, McIntyre and his partners were going up to Umatilla county and look

over the work which they did before the supplemental contract of May 29, 1931, was executed. After that nothing was said, as appears from the testimony, by either Biggs or Hallyburton, or by any of the plaintiffs, on behalf of Biggs and Hallyburton, to the defendant, Aetna Casualty & Surety Company, or to Mr. Lively, its agent, or to any agent of the company in regard to coverage for the second contract, or in regard to writing a bond or extending the bond that had already been written to cover the work embraced in the second contract, nor was anything done by anyone in this respect.

Biggs and Hallyburton paid the premium on the bond covering the first contract. They paid no premium for any work done under the second contract. No writing was executed by the Aetna Casualty & Surety Company, or by Mr. Lively, or any agent, extending this surety agreement to cover this second contract. Mr. McIntyre, one of the plaintiffs, testified that he told Biggs and Hallyburton that he would go down to Portland and discuss the matter with his partners and also with Mr. Lively. He states he went to Portland, discussed it with his partners and then went to the office of Mr. Lively, and the following is the gist of what was said:

"Q. (By Mr. Conley) Did you tell Mr. Lively at that time what you had told Mr. Biggs and Mr. Hallyburton with respect to the necessity for this additional work being bonded?

\* \* \*

Q. (By Mr. Conley) Yes; just state what was said there with respect to this second job, the second work?

A. I don't recall, now.

Q. Now, in discussing this request of Biggs & Hallyburton for additional work, did you ask Mr. Lively anything about the coverage?

A. Yes.

Q. Of that work by the bond?

A. Yes. Mr. Lively said that they couldn't give them any more bond than what they had, but it would be covered by that bond and we told him that we didn't require any larger bond than the fifteen thousand dollar bond but we wanted to know if that fifteen thousand dollar bond would cover the additional work and he said that it would. He couldn't write over the fifteen thousand dollar bond but it would cover that, and that they would be required to pay the additional premium, and he asked for a copy of the contract.''

Mr. Lively's version is in part as follows:

''Q. * * * Now I want to ask you, Mr. Lively, whether you have any authority, or ever held yourself out as having any authority, to modify or extend the coverage on a bond after it has been executed.

A. I have not.

Q. You have no authority to extend or modify a bond after it has been executed?

A. Not without the home office's written consent.

Mr. Conley: I think, Your Honor, that his power of attorney and everything are in evidence here, and his statement—that is not the best evidence of his authority. For the agent himself to be able to state in court what his authority is, when his authority is in writing, it seems to me that that is inadmissible, and I object to it.

The Court: Well, the first question that was asked by Mr. Senn was whether he had the authority or if he had ever claimed that he had it.

A. I never have claimed it.

* * *

Q. Do you know of any reputation or general understanding in this community that you have that authority?

A. I never heard of it.

Q. Did you ever exercise it without the consent of the home office?

A. No, sir.

Q. Now, in this particular case did you ever get the consent, or ever take up with the home office the extension of this bond to cover the additional work?

A. I did not.

Q. Did you ever get any consent from the home office or anything of that kind to extend that bond?

A. I did not.

Q. Did the home office ever have any knowledge or notice, so far as you know, that any effort had been made or claimed that you had extended the bond or a modification of it?

A. Not to my knowledge.

Q. I will ask you to state whether you ever entered into any agreement with the plaintiffs, or anyone else representing them, or any of their agents, extending the coverage of this bond which is in evidence here, to include additional work, particularly the work set forth in Defendants' Exhibit No. 77, dated May 29th, and Plaintiffs' Exhibit No. 4, that is, this second contract, an extension of this contract?

A. No, sir, I did not.

Q. Now, I will ask you to state, Mr. Lively, whether Mr. Borin or Mr. McIntyre or Mr. Craswell, or some of them or all of them, whoever they were, ever came to you after the original bond was executed?

A. Yes.

Q. And what conversation did you have with them at that time, if any?

\* \* \*

A. They were in the office quite a number of times, and they were in the office shortly after the original bond had been executed and delivered. At that time they discussed with me the question of the increase of the contract, knowing, I presume, that the quantities would be increased on that contract. They asked me if there would be an additional premium and if it would be covered under that bond. I advised them that it would not be covered under the bond and there would be an additional premium if the quantities ran over the estimated quantities arrived at in the original contract.

Q. You mean you refer to Plaintiffs' Exhibit 2, the original contract dated May 12th?

A. Yes.

Q. Was that the contract that you were discussing with them?

A. That is the contract I had in mind and discussed with them."

The plaintiffs endeavored to establish the scope of Mr. Lively's apparent authority by evidence of general reputation of his ability to bind the company. There is not a particle of evidence that Mr. Lively ever did any similar act which was acquiesced in by the Aetna Casualty & Surety Company. Taking it for granted that Mr. Lively made the representation as alleged, still the Aetna Casualty & Surety Company is not bound, unless he had either actual or apparent authority to make the same.

■ An agent's statement is not binding upon his principal unless the agent was acting within the scope of his authority, either real or apparent. The trial court found, and the testimony showed, that the second contract actually increased the risk. The work under the first contract amounted to about $20,000, and under the second contract to over $28,000. One of the defendant contractors testified that the main part of the loss fell onto the second contract. The court found that actual loss was sustained on the work performed under the second contract.

■ The agent Lively acted by virtue of the power of attorney evidencing his authority, which provided, in effect, that Karl V. Lively "as such Resident Vice-President has full power and authority to sign and execute, on behalf of The Aetna Accident and Liability Company, any and all bonds and undertakings, and all bonds and undertakings signed by him, when sealed and attested by a Resident Assistant Secretary, shall

be as valid and binding upon the Company as if said bonds and undertakings had been signed by the President and duly sealed and attested." This power of attorney was on file with the Insurance Department of the State of Oregon and was introduced in evidence by the plaintiffs. It was filed for the information of plaintiffs, or anyone. The power of attorney gives no authority to Mr. Lively to extend the coverage or liability of a bond already executed. He had no real or apparent authority to extend the coverage of the bond of $15,000, given to cover the work on the second contract.

We read in 2 Am. Jur. 91, § 108, thus:

"The general principle as expressed by the American Law Institute is that, unless it is otherwise agreed, authority to make a specified contract includes authority to make it in a usual form and with usual terms or, if there are no usual forms or terms, in an appropriate way, and to do other acts incidental to its making which are, under like circumstances, usually done or which, if not usually done, are reasonably necessary for making the contract. Authority incidental to authority to make a contract does not include authority to perform it or accept performance, to transfer or assign it, to bring suit upon it, *to alter its terms, to rescind it, or to waive its conditions* or otherwise diminish or discharge the obligations of the third person. * * *" (Italics ours)

The bond which the plaintiffs attempt to extend is unambiguous and provides for a specific obligation, *inter alia,* for the doing of work by Biggs and Hallyburton from Station 350.50 to Station 522.50 in accordance with the specifications set forth in the contract between the Oregon State Highway Commission and the plaintiffs. It will therefore be seen that the liability of the bond was specifically limited by this written

agreement to cover work between these mentioned stations, and not otherwise. The plaintiffs brought the action upon this bond.

The complaint alleges that some time prior to May 29, 1931, the defendant surety company agreed that said bond would be extended to and cover said additional work. This would be an entirely new contract. The obligation of the surety would be increased by this oral conversation approximately 150 per cent. No premium was ever paid for this increased liability. No consideration was ever paid, incurred or expressed between the plaintiffs and the defendant surety company for this additional increased liability. The surety company could not, under any circumstances, collect the premium from the plaintiffs for this additional hazard or this additional coverage. Biggs and Hallyburton signed an application for the bond on the first contract. They never made application for any other bond except that Mr. McIntyre casually mentioned the matter to Mr. Lively for them. They never agreed to pay any further premium.

In the case of *Marks v. Twohy Bros. Co.*, 98 Or. 514, 527 (194 P. 675), this court laid down the rule as follows:

"It is a well-established rule of the common law, which has been embodied in the statutes of a number of the states, including Oregon, that when any grant or other disposition of property, or any contract, agreement, or undertaking has been reduced to writing, and is evidenced by a document, such document cannot be contradicted, altered, added to, or varied by parol or extrinsic evidence. The rule is founded on the long experience that written evidence is so much more certain and accurate than that which is based on memory only that it would be unsafe, when the parties have expressed the terms of their agreement in writing,

to admit weaker evidence to control and vary the stronger, and thereby show that the parties intended a different contract from that expressed in the written memorial signed by them. It is obvious that but for the rule, written instruments would soon come to be of little value if their explicit provisions could be varied, controlled, or superseded by parol evidence, and it is plain that a different rule would greatly increase the temptations to commit perjury. According to the modern and better view, the rule which prohibits the modification of a written contract by parol is one not of evidence merely but of substantive law: 22 C. J. 1070, § 1380.''

■ We are advertent of the rule that under certain conditions certain written instruments may be discharged or even modified by a subsequent parol contract, but the evidence sustaining such subsequent parol contract must be clear, convincing and conclusive and it must be predicated upon a legal and valid consideration. In the instant case we have no evidence whatsoever of any legal or valid consideration for the tremendous added liability which plaintiffs seek to fasten upon the surety by virtue of this oral conversation.

In *Propst v. William Hanley Co.*, 94 Or. 397 (185 P. 766), the question of a waiver or change in a written contract by parol evidence was under consideration. This court said:

''Waiver may be made the subject of contract, for which a consideration is requisite, the same as in any other contract.''

22 C. J. 1275, § 1695, lays down the rule thus:

''It is usually considered that in order to render evidence of a subsequent parol agreement admissible to vary the terms of a written contract, it is necessary that such subsequent agreement is founded upon a

consideration, although a contrary view has been asserted." See also *Porter v. Sims Co.*, 55 Fla. 504, 508 (46 S. 420).

50 C. J. 21, § 20, recites the rule in regard to what is necessary in formulating a suretyship contract as follows:

"To enter into a valid contract creating the relation of principal and surety, as in the case of other contracts, there must be competent parties, an offer and acceptance, and a valid consideration, as well as a sufficient compliance with the formalities, if any, required by law."

■ The rule is quite universal that the power to execute a contract or agreement does not grant authority or power to vary an agreement after the same has been executed, nor is the power to vary an agreement after execution inferred from a general power to make it: 2 C. J. 645, § 289; *Standard Acc. Ins. Co. v. Simpson*, 64 F. (2d) 583, 587; 2 Am. Jur. 91, § 108. It is stated in 2 C. J. 645, § 289, as follows:

"Presumptively an agent is employed to make contracts, not to rescind or modify them, to acquire interests, not to give them up, and no power to cancel or vary an agreement is to be inferred from a general power to make it, nor has the agent any implied power to waive or give up rights or interests for his principal, or to increase his obligations and liabilities for the mere benefit of third persons, unless the principal knows or approves of such modifications by the agent."

■ The authority of Mr. Lively is a matter of public record. This was constructive notice to the plaintiffs as to his authority: 2 Am. Jur. 81, § 100.

The finding of the trial judge, acting as a trier of fact, that the evidence in this case does not sustain authority in Mr. Lively, either express or implied, to

enter into this extraordinary agreement is amply sustained by the testimony in this case: 2 Am. Jur. 68, § 85. On May 12, 1931, the original contract between the plaintiffs and Biggs and Hallyburton was entered into by virtue of which contract Biggs and Hallyburton undertook to do the road work from Station 350.50 to Station 522.50. This contract aggregated $18,337. The total contract which plaintiffs had secured from the state aggregated approximately $56,000.

One of the plaintiffs testified, in effect, that "Mr. Lively said that they couldn't give them any more bond than what they had" because it was felt that Biggs and Hallyburton were not financially able to carry out the contract in excess of the amount set forth in the contract of May 12, 1931. This contract with Biggs and Hallyburton was not signed until May 12, 1931, and the bond was not executed until May 14, 1931. Yet the plaintiffs claim that on or about May 25th or 26th, Biggs and Hallyburton again approached them for some additional work, and that the plaintiffs then had a conference and decided to give it to them; that they then called upon Lively in Portland and Lively at that time informed them he could not give them any more bond, but that this bond would cover the additional contract, which increased the work about 150 per cent.

Plaintiffs endeavor to hold the Aetna Casualty & Surety Company liable for an oral statement, which they claim Lively made, for the faithful performance of the contract entered into May 29, 1931, which, as above stated, provided for approximately $28,000 or $30,000, as found by the trial judge.

■ Section 9-909, Oregon Code 1930, provides that an agreement to answer for the debt, default or miscar-

riage of another must be in writing. This statute is especially applicable to the facts in this case. The Oregon statute of frauds is more comprehensive in its language and more drastic in its application than most of the statutes of other states. In applying this statute to a contract of suretyship a practical application should be made: 27 C. J. 129, § 13; *Fitzgerald v. Neal,* 113 Or. 103, 120 (231 P. 645); *Commercial Credit Corp. v. Marden,* 155 Or. 29, 34-38 (62 P. (2d) 573, 112 A. L. R. 931).

Section 9-909 not only provides that the writing must be subscribed by the party to be charged, or his lawfully authorized agent, but it provides that evidence of the agreement shall not be received other than the writing, and that the agreement is void unless the same or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party to be charged, or by his lawfully authorized agent.

The facts in *Commercial Credit Corp. v. Marden,* supra, are similar to those in the instant case. At page 40 the court records the following language:

"In deciding this matter it must be borne in mind that, in order to be binding upon the defendants the statute of frauds requires that the undertaking must have been subscribed by them. * * *" See *Masters v. Bidler,* 101 Or. 322, 335 (198 P. 912, 199 P. 920); *Lueddemann v. Rudolf,* 79 Or. 248 (154 P. 116, 155 P. 172); *Taggart v. Hunter,* 78 Or. 139 (150 P. 738, 152 P. 871, Ann. Cas. 1918A, 128).

In the Marden case the suretyship agreement was not signed, but the justification was signed by the sureties and the court held that our statute was so stringent that it required more than the signing of the mere justification in order to bind the surety.

■ In the instant case the agreement declared upon by the plaintiffs was a regular agreement to answer for the debt, default or miscarriage of another and comes clearly within the statute of frauds. Biggs and Hallyburton were primarily liable on the contract. The Aetna Casualty & Surety Company was simply a guarantor on the bond: Stearns on The Law of Suretyship, (4th Ed.) 41; Rowlatt on Principal and Surety, (2d Ed.) 31; 21 R. C. L. 962, § 17; *Mead v. White,* 53 Wash. 638 (102 P. 753, 23 L. R. A. (N. S.) 1197, 132 Am. St. Rep. 1092); *Standard Acc. Ins. Co. v. Simpson,* 64 Fed. (2d) 583, Certiorari denied, 290 U. S. 688. Stearns on The Law of Suretyship, (4th Ed.) 41, reads as follows:

"All contracts of suretyship are within the statute of frauds. There are no exceptions under the Statute of Frauds."

Rowlatt on Principal and Surety, (2d Ed.) 31, reads thus:

"The effect of the clause now under consideration upon the law of principal and surety is, speaking generally, to require that every guarantee shall be evidenced by a writing fulfilling the conditions prescribed by the statute."

In 21 R. C. L. 962, § 17, we find the following language:

"A contract of suretyship is in the nature of a collateral engagement to pay the debt of another as distinguished from an original and direct agreement for the party's own act. It therefore comes ordinarly within the purview of the statute of frauds and must be in writing, the rule being stated as follows: When the leading object of the promise or agreement is to become guarantor or surety to the promisee, for a debt for which a third person is and continues to be primarily liable, the agreement, whether made before or after or

at the time with the promise of the principal, is within the statute, and not binding unless evidenced by writing.''

There are cases where the alleged surety or guarantor was an original promisor. He was liable for the performance of the contract and sometimes shared in the profits of the contract. In the instant case the Aetna Casualty & Surety Company had no interest in the contract; there was no debt at the time of the execution of the bond referred to. It was not known at that time that there would ever be a default or debt due from Biggs and Hallyburton. It is purely a guaranty that in case Biggs and Hallyburton failed to comply with their contract, the Aetna Casualty & Surety Company would answer for their debt and default.

The Supreme Court of Washington, in the case of *Mead v. White,* supra, where the defendants had become sureties for the contractor, records the following language on page 640 of the report:

''The appellants contend, first, that the contract of the respondents is an original undertaking rather than a collateral one, and as such that it is not within the statute. We will first notice this contention. When the object of the undertaking is to become surety for another, the promise is collateral and must be in writing. 20 Cyc. 163. In Nugent v. Wolfe, 111 Pa. St. 471, 480, 4 Atl. 15, 56 Am. Rep. 291, speaking to the question of the distinction between an original and a collateral promise, the court say:

'' 'It is difficult, if not impossible, to formulate a rule by which to determine in every case whether a promise relating to the debt or liability of a third person is or is not within the statute; but, as a general rule, when the leading object of the promise or agreement is to become guarantor or surety to the promisee, for a debt for which a third party is and continues to be primarily

liable, the agreement, whether made before or after, or at the time with the promise of the principal, is within the statute, and not binding unless evidenced by writing. On the other hand, when the leading object of the promisor is to subserve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, his promise is not within the statute.'"

In *Allen v. Kitchen*, 16 Idaho 133 (100 P. 1052, L. R. A. 1917A, 563, 18 Ann. Cas. 914), Mr. Justice Ailshie, as shown on page 1056 of the Pacific Reporter, used the following language:'

"There is no contract until it is reduced to writing as provided by law. It is not a question as to what the contract was intended to be, but, rather, was it consummated by being reduced to writing as prescribed by the statute of frauds. Admittedly an essential portion of the contract in this case was not reduced to writing and subscribed by the party to be bound. * * *"

■ Since the original contract must be in writing, a modification or change in the contract must also be in writing: 17 A. L. R. 14; 80 A. L. R. 540, citing numerous cases, among them, *Osburn v. DeForce,* 122 Or. 360 (257 P. 685, 258 P. 823).

■ It is contended by plaintiffs that, since the oral agreement or modification was relied upon by the parties and executed by one of the parties it is taken out of the statute. It must be remembered that the contract to do this work was between the plaintiffs and Biggs and Hallyburton, and before any part-performance can take the matter out of the statute of frauds, it must be shown that the oral agreement was made by a person qualified and authorized to make it. Lively was not authorized to make an oral agreement, as claimed: Bigelow on Estoppel, (6th Ed.) 618; *Kingsley v.*

*Kressly,* 60 Or. 167, 173 (111 P. 385, 118 P. 678, Ann. Cas. 1913E, 746) ; *Rogers v. Maloney,* 85 Or. 61, 64 (165 P. 357) ; *Dunis v. Director,* 121 Or. 500 (255 P. 474).

■ It is contended by plaintiffs that the court erred in not holding that the defendant Aetna Casualty & Surety Company had waived any lack of authority on the part of its agent, and any irregularity in the nature of the agreement to extend coverage of the bond to the additional work, and that it was estopped by reason of its conduct and by reason of the agreement that had been executed by the plaintiffs in good faith. The defendant surety company is not bound by any estoppel or waiver unless it be established that the waiver or the estoppel resulted from the acts of an agent who possessed authority to create a waiver or an estoppel. In the instant case the trial court found that Mr. Lively had no authority to enter into the agreement in the first instance; and, second, that any agreement such as contended for in the instant case must be in writing. We concur in such finding. See Bigelow on Estoppel, (6th Ed.) 618; *Oregon v. Portland Gen. Elec. Co.,* 52 Or. 502, 528 (95 P. 722, 98 P. 160) ; *Urquhart v. Belloni,* 57 Or. 314, 321 (111 P. 692); *Killam v. Multnomah County,* 137 Or. 562, 568 (4 P. (2d) 323); *Standard Acci. Ins. Co. v. Simpson,* supra.

■ The solemnity of a written agreement should not be frittered away by waiver or estoppel, except in cases of clear and convincing situations. Speaking of estoppel, this court, in *Killam v. Multnomah County,* supra, used the following language:

"We cannot see where the doctrine of equitable estoppel should be applied. This doctrine should only be applied in exceptional cases: Oliver v. Synhorst, supra; Cruson v. City of Lebanon, supra."

It would be strange indeed to hold that while Mr. Lively did not have any authority to enter into the agreement as alleged by plaintiffs, and the same was not binding upon the defendant surety company because not in writing, yet since he has made the agreement the defendant is bound because of the doctrine of waiver or estoppel; in other words, that which cannot be done directly may be done indirectly. The doctrine of estoppel or waiver in the instant case cannot reasonably be applied.

In *Oregon v. Portland General Electric Co.,* supra, this court laid down the elements of estoppel in the following words, as shown on page 528:

"To constitute estoppel by conduct there must (1) be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; (5) the other party must have been induced to act upon it: Bigelow, Estoppel, (5th Ed.) 569, 570."

It is not shown that the Aetna Casualty & Surety Company knew anything about the agreement as claimed by plaintiffs and was not connected in any way with the same and never ratified or acquiesced in such agreement in any way.

We have carefully examined the authorities cited by the plaintiffs but are not convinced that we should change our decision as it is above announced.

Finding no error in the record, the judgment of the circuit court is affirmed.

BAILEY, RAND and LUSK, JJ., concur.