**OREGON PORTLAND CEMENT CO.**

**v.**

**E. I. DU PONT DE NEMOURS & CO.**

**Civ. A. No. 6341.**

United States District Court
D. Oregon.
April 16, 1953.

Robert S. Miller, Fredric A. Yerke, Jr., and King, Miller, Anderson, Nash & Yerke, Portland, Or., for plaintiff.

Hugh L. Biggs, Cleveland C. Cory, and Hart, Spencer, McCulloch, Rockwood & Davies, Portland, Or., for defendant.

SOLOMON, District Judge.

Plaintiff filed this action against defendant to recover $35,000. Its complaint alleged that a blast, supervised and directed by defendant's employees, at plaintiff's shale quarry located in Baker County, Oregon, on February 23, 1950, failed to move, loosen and break the rock in sufficient quantity to permit it to successfully continue its quarry operations except at great additional expense. It predicated its claim for damages on breach of warranty or, in the alternative, upon the negligence of the defendant.

The defendant denied the material allegations of the complaint and, as a separate defense, alleged that plaintiff may not maintain this action by reason of the fact that, on April 24, 1946, it had executed the following release (hereinafter referred to as "release" or "Exhibit A").

"Standard Release as Approved by the Institute of Makers of Explosives

"E. I. Du Pont de Nemours & Company, Inc.

"Wilmington, Delaware

"Dated April 24, 1946.

"WHEREAS, the undersigned customer may hereafter, from time to time, request certain assistance of E. I. du Pont de Nemours & Company, Inc. in connection with the performance of certain blasting work; and

"WHEREAS, E. I. du Pont de Nemours & Company, Inc. is not engaged in blasting work, its business in explosives being confined solely to the manufacture and sale thereof, but to assist the said customer, the said E. I. du Pont de Nemours & Company, Inc. has agreed, at certain times, to permit said customer the temporary use, free of charge, of the services of said company's employes, together with or without certain needed equipment.

"NOW, THEREFORE, the undersigned hereby expressly agrees that, while engaged in said work, said employes and equipment are and shall be, on each occasion, to all intents and purposes, the employes and equipment of the undersigned and subject to his sole supervision and control, and that all work and services so performed shall be at the sole risk and responsibility of the undersigned, and for any damage or loss resulting from such services, except liability for injury or death of said E. I. du Pont de Nemours & Company, Inc. employes, the undersigned expressly agrees to indemnify and hold harmless the E. I. du Pont de Nemours & Company, Inc. and further to assume sole responsibility for the result of the services of such employees or equipment gratuitously furnished

by said E. I. du Pont de Nemours & Company, Inc.

"This agreement shall continue in force until either party notifies the other, in writing, of its desire to terminate the same, but such termination shall not relieve either party of any liability arising thereunder prior to such termination.

"Oregon Portland Cement Company
"Customer
"by D. H. Leche

"D. H. Leche, Vice-Pres."

At the request of the parties, the court ordered that all issues connected with such release be segregated and tried separately before the court.

Based upon the evidence adduced at the trial on this segregated issue and the facts agreed to in the pretrial order, I am of the opinion that the release agreement executed by plaintiff in favor of the defendant is a valid and binding agreement and that it was in effect on February 23, 1950, the date upon which the explosives were detonated. For that reason, I find that plaintiff may not maintain an action for breach of warranty. I likewise find that such release bars plaintiff from maintaining an action for negligence on any of the grounds set forth in the pretrial order with the exception of its claim that the defendant negligently furnished plaintiff with incompetent and inexperienced employees to supervise the 1950 "coyote shot."

Comment

Plaintiff, in its supplemental memorandum of authorities, set out the issues which it contends are presently before the court for determination. I shall consider such issues seriatim:

No. 1: "Is the language contained in Exhibit A broad enough to encompass the 1950 'coyote shot,' as well as the 1946 'coyote shot'?"

■ This release was delivered to the defendant, at defendant's request, prior to the 1946 "coyote shot" and no technical assistance was requested of or furnished by defendant from the date of such shot until 1949, when preparations were being made for the 1950 shot. However, the language of the release, whether considered alone or in connection with the relationship of the parties and the type of work in which each was engaged, shows that it was intended to cover all transactions in which the defendant furnished technical assistance from the date of its execution until such agreement was terminated by notice. I therefore find that it did cover the 1950 "coyote shot."

No. 2. "Does the language contained in Exhibit A have the operative effect of relieving defendant from liability for the negligent conduct of the employees which it furnishd plaintiff for the 1950 'coyote shot'?"

■ The plaintiff contends that, even if such contract is not against public policy, it must be strictly construed and, in the absence of clear and unequivocal language, the court will not relieve the indemnitee from liability for the negligent conduct of its own employees. A fair reading of this release, which is the "Standard Release As Approved By the Institute of Makers of Explosives," convinces me that it was intended to cover claims of such kind made against the suppliers of explosives and that it should be so construed.

■ In addition, the release specifically provides that the employees furnished by the defendant "shall be, on each occasion, to all intents and purposes, the employees * * * of the undersigned and subject to his sole supervision and control." In other words, it specifically invokes the well-established "loaned servant doctrine" which has been summarized as follows:

> "If an employer loans a servant to another for some special service, such servant, with respect to that special service, becomes the servant of the party to whom his services have been loaned." Bailey, Personal Injuries, Second Edition, Volume 1, § 25, pages 50–51.

See also Denton v. Yazoo & Mississippi Valley Railroad Co., 1931, 284 U.S.

305, 52 S.Ct. 141, 76 L.Ed. 310. Therefore, in this case, the employees of the defendant who supervised the preparation and detonation of the explosives were, at such times, employees of the plaintiff and their acts were the acts of the plaintiff and not the defendant.

No. 3. "Does the language contained in Exhibit A have the operative effect of relieving defendant from liability for negligence in furnishing plaintiff incompetent and inexperienced employees?"

As I have previously pointed out, I do not believe that it does. In my opinion, plaintiff may predicate liability on such ground.

No. 4. "Is Exhibit A void as an attempt to indemnify an indemnitee against the consequences of its own negligence?"

In my opinion it does not. Subject to the requirement of specificity in cases in which the parties are dealing at arm's length and in which the activities of one or both of the parties are not intimately concerned with the public welfare (such as public utility companies), such contracts are valid. The case of Southern Pacific Co. v. Layman, 1944, 173 Or. 275, 145 P.2d 295, particularly when construed with Glens Falls Indemnity Co. v. Reimers, 1945, 176 Or. 47, 155 P.2d 923, indicates that such contracts are not void as against public policy in Oregon.

No. 5. "Was Exhibit A terminated prior to the detonation of the 1950 'coyote shot'?"

Plaintiff's witnesses testified that Lauchlan McLean, plaintiff's acting superintendent at the quarry, on or about January 5, 1950, notified Robert C. Richards, defendant's salesman, by telephone that plaintiff "was holding du Pont responsible for the success of the shot" and that Richards did not dispute this statement or indicate a refusal to accept such responsibility. Two other employees of the plaintiff testified that identical language was used on at least two other occasions in conversations not only with Richards but also with Roy H. Larson, a technical service representative of the defendant. Both Richards and Larson do not recall any such conversation and specifically deny that such words were used.

By these alleged conversations, plaintiff attempted to spell out a new oral contract which is inconsistent with the release and which would therefore have the effect of terminating it. During the trial, I indicated that the provision in the release that this agreement "shall continue in force until either party notifies the other in writing of his desire to terminate the same," does not prevent its termination by oral notice or by a subsequent oral contract inconsistent with the release.

However, when a contract contains a provision that it may only be terminated by a notice in writing, the notice of termination, if oral, must be unequivocal and must be proved by clear and convincing evidence. The same is true of a subsequent oral contract, alleged to be inconsistent with the prior written contract.

In my opinion, plaintiff's evidence does not satisfy this standard. At the time these conversations took place, D. H. Leche, plaintiff's vice president, was the only witness who had knowledge of the release and at such time he did not remember having executed it. The 1946 "coyote shot" was a great success; in fact, it was more successful than plaintiff anticipated it would be. It is admitted that the release was valid as to the 1946 shot. In view of such history, is it reasonable that Mr. Leche would insist that the defendant take full responsibility for the success of the 1950 shot?

Mr. Leche is an experienced executive. If he wanted to place full responsibility for the success of a blast upon a supplier of explosives, who was furnishing gratuitous technical assistance, it seems to me that he would not have treated this matter in such a casual manner. He did not write or call any official of the de-

fendant. Instead, he testified, he telephoned his acting superintendent at the quarry to call defendant's salesman and give him this information. There were a number of conversations testified to at the trial: the telephone conversation between Mr. Leche and Mr. McLean; the telephone conversation between Mr. Richards and J. M. McClenahen, plaintiff's regular superintendent at the quarry; the conversation between Mr. McLean and Mr. Richards and Mr. Larson in the office of A. R. Moore, plaintiff's plant engineer. It is strange that, in March 1953, or even in the summer of 1952, all of plaintiff's witnesses testified that, in these various conversations, which occurred in January 1950, the identical words were used, namely, plaintiff is "holding du Pont responsible for the success of the shot."

In spite of such testimony, I am not convinced that such words were used and, even if used, I am convinced that they were intended to convey the meaning that Mr. Leche wanted du Pont employees to take charge of and direct the technical details concerning the preparation and detonation of the shot without interference from plaintiff's employees.

For all these reasons, I am of the opinion that the release was not terminated prior to the 1950 "coyote shot."

No. 6. "Is defendant estopped to assert that Exhibit A is a bar to the claims asserted herein by plaintiff?"

My discussion of issue No. 5 is sufficient to indicate that I do not believe the evidence submitted at the trial warrants a finding that the defendant is estopped to assert the validity of the release. "The solemnity of a written agreement should not be frittered away by waiver or estoppel, except in cases of clear and convincing situations." Craswell v. Biggs, 1939, 160 Or. 547, 567, 86 P.2d 71, 79. I do not believe that such a situation exists here.

I am fortified in such belief by the fact that, in addition to the lack of satisfactory evidence upon which to predicate estoppel, neither Mr. Richards nor Mr. Larson had authority to vary or terminate the release and, lacking such authority or apparent authority, neither of them by his conduct could bind the defendant by estoppel.