**In re TECHNOLOGY FOR ENERGY CORP., Debtor.**

**PUBLIC SERVICE ELECTRIC & GAS CO., .& Bechtel Engineering Co., Inc., Plaintiffs,**

**v.**

**TECHNOLOGY FOR ENERGY CORP., & American Insurance Company, Defendants.**

**Bankruptcy No. 3–85–00455. Adv. No. 1–89–0266.**

United States Bankruptcy Court, E.D. Tennessee.

May 12, 1992.

John A. Lucas and Jeffrey S. Norwood of Hunton & Williams, Knoxville, Tenn., for Public Service Elec. & Gas Co. & Bechtel Engineering Co., Inc.

G. Rhea Bucy & A. Scott Derrick of Gullett, Sanford, Robinson & Martin, and Lawrence R. Ahern, III of Bass, Berry & Sims, Nashville, Tenn., for Technology for Energy Corp.

Robert L. Crossley and Nicholas A. Della Volpe of Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, Tenn., and Thomas E. Ray of Ray & Swafford, Chattanooga, Tenn., for American Ins. Co.

## MEMORANDUM

RALPH H. KELLEY, Chief Judge.

The plaintiffs, Bechtel and Public Service, needed a radiation monitoring system for a nuclear power plant in New Jersey. Technology for Energy Corporation (TEC) agreed to build the system. The contract is made up of two purchase orders. For each purchase order, TEC obtained a payment and performance bond from American Insurance. Bechtel and Public Service brought this suit primarily to recover from American under the bonds.

The court and the parties agreed to divide the issues for trial. The first issue is whether American can be liable for more than the penal sums stated in the bonds. This is the court's second opinion on this question. In an earlier opinion the court rejected all the arguments made by Bechtel and Public Service except one. This opinion deals with the remaining argument.

For convenience, the court will refer to the two purchase orders as one contract and the two bonds as one bond. The bonds are the same except that they refer to different purchase orders and have different penal sums. The court will refer to Bechtel and Public Service as Bechtel.

For the purpose of argument, the court assumes that TEC defaulted in its performance of the purchase orders. This brings the court to Bechtel's remaining argument.

The penal sum equals the original contract price of about $3,900,000. Changes in the contract made the contract price increase to about $6,950,000. The bond waives notice of changes in the contract and provides that changes will not release American Insurance from liability under the bond. Bechtel argues that there is a custom of the trade under which the penal sum automatically increased from the original contract price to the much larger contract price that resulted from the changes.

Two kinds of evidence could be used to prove the alleged custom: (1) evidence that the surety business in general follows the alleged custom, and (2) evidence that American Insurance, until it denied liability, dealt with TEC and Bechtel as if the custom exists.

The court begins with basic rules and practices in the surety business. After that, the court takes up the testimony of individual witnesses.

Why does a contractor obtain a payment or performance bond from a surety company, and how does the contractor obtain it? The owner will require the contractor to

obtain a bond. The owner decides whether it wants the amount of the bond (the penal sum) to be 100% or 50% or some other percentage of the original contract price. Bonds on some government contracts are commonly 50% bonds.

The contractor will go to an insurance agent to obtain the bond. The insurance agent's job is to help convince a surety company to issue the bond. The insurance agent gathers information a surety company will need to decide whether to issue the bond. For example, a surety needs to know whether the contract involves the kind of work the contractor has done in the past, whether the contractor has the capacity to do the amount of work called for by the contract, the present and past financial condition of the contractor, and the character and personal financial condition of the principals in the business. With this kind of information, the agent attempts to obtain the bond from a surety company.

The surety company's underwriters use the information to decide whether the company should take the risk of issuing the bond. Underwriters consider a wide variety of information about the contractor and the contract.

When a surety issues a bond for a contractor, the contractor becomes one of the surety's accounts. The surety may or may not make a separate underwriting decision on each contract for which the contractor requests a bond. The contractor's account means all the bonds already issued for the contractor and its standing with the surety with regard to obtaining new bonds.

If the surety company decides to issue the bond, the surety company or the agent must collect the premium. A surety company must file its premium rates with the state insurance commission. In simplified terms, the surety calculates the original premium by multiplying the original contract price by the appropriate premium rate.

If the contract price goes up during the contractor's performance of the contract, the surety is entitled to collect an additional premium from the contractor. The surety is entitled to more premium because the increase in the contract price indicates an increase in the surety's risk of loss.

If the surety collects an additional premium when the contract price increases, the insurance agent is entitled to an additional commission.

The surety usually makes a final adjustment of the premium after the contract is completed. The surety is entitled to more premium if the final cost is more than the original contract price, and the contractor is entitled to a refund if the final cost is less than the original contract price. Small adjustments may be ignored. For example, the surety may not charge or refund a premium of less than $50.

The bond itself does not say anything about the premium. It does not tell how the original premium is calculated. It does not say that the contractor will be liable for more premium if the contract price goes up. It does not say that the contractor will be entitled to a refund if the final contract price is less than the original contract price.

The contractor generally does not submit a written bond application that might include a promise to pay the premium.

There appear to be two sources for the surety's right to collect the premium. First is the bond rate manual. Second is the indemnity agreement between the surety and the contractor.

The bond rate manual is a standard manual used by sureties to calculate premiums. It explains how to calculate the original premium and how the premium is affected by increases and decreases in the contract price.

The indemnity agreement requires more explanation. Between the surety and the contractor, the bond is a credit transaction, not insurance. If the contractor defaults and surety pays the owner or completes the contract, the surety has a claim against the contractor. In legal jargon, the surety has a right to indemnity from the contractor. The surety may also have an indemnity agreement with third-party indemnitors, that is, indemnitors other than the contractor.

One witness, who has many years experience in the business, testified that the general indemnity agreement between the surety and the contractor includes an agreement by the contractor to pay the bond premium.

The penal sum of the bond is usually 100% of the contract price, but this does not mean the premium is calculated on the penal sum. It is still calculated on the contract price. The premium for a bond is the same if the penal sum is 50% or 100% of the contract price.

The premium may be based on the penal sum when it is a small percentage of the contract price. For example, if the penal sum is only 20% of the contract price, then the penal sum may be used to calculate premium instead of the contract price.

Changes in the contract may give the surety a defense that the witnesses called "exoneration" or "cardinal change." The court prefers cardinal change as a clearer description. If the owner and the contractor change the bonded contract too much, then the surety is released from the bond. In other words, a cardinal change in the bonded contract releases the surety.

Susie Benson is the insurance agent that helped TEC obtain the bond from American Insurance. She was the bond manager at the first agency where she began working in 1973 and at other agencies where she worked before 1980. In 1980 she and another person were hired to set up the Knoxville office of a nationwide insurance agency, Marsh & McLennan. While employed by Marsh & McLennan, Ms. Benson helped TEC obtain the bonds from American Insurance.

She dealt mostly with Jim Zorns. He was an underwriter in the Nashville office of Fireman's Fund and frequently came to Knoxville. Mr. Zorns was with Fireman's Fund, not American Insurance Company, but American is one of several companies in the Fireman's Fund group of insurance companies. When the parties mentioned Fireman's Fund or its employees, they were treating them as American Insurance and its employees.

When Ms. Benson learned of the large increase in the contract price, she was excited at the prospect of collecting another commission. She was emphasizing collecting the additional premium in order to collect the additional commission.

She talked with or wrote to Mr. Zorns about the increase in the contract price and collection of the additional premium. Mr. Zorns, as the underwriter, might not have been pleased by the increase in the contract price because it indicated major changes in the contract. Mr. Zorns wanted to know each component of the changes, not just the total amount, because the bond covers the contract. He needed to know what the contract was.

Mr. Zorns told her that American would not bill the additional premium unless Bechtel would pay it. Plaintiff's Exhibit 11 is a handwritten calculation of the additional premium and the additional commission. It includes the note, "Bectal will pay bond premium!" Ms. Benson testified that this note did not look like her handwriting.

Based on her prior experience with sureties and bonds, she understood that the increase in the contract price increased American's liability under the bond. She understood the penal sum to mean the total contract price, including increases. She said that there is a general understanding that the bond amount goes up as changes increase the contract price and require payment of an additional premium.

She did not recall whether Mr. Zorns ever said American was liable for the increased contract price. He was mostly concerned with getting the change orders so that he could see what happened to the contract.

The next witness was Jim Zorns, the Fireman's Fund underwriter. After Mr. Zorns graduated from college in 1970, he went to work for Prudential Insurance, but in 1972 he took a job with Travelers Indemnity as a bond trainee and became a bond underwriter. In 1976 he went to work for Fireman's Fund as senior bond underwriter in its Nashville office. He worked there until 1985 when he took a job as the bond manager in the Nashville office of the St.

Paul Companies; his territory is the state of Tennessee.

Mr. Zorns was asked about a memo dated September 27, 1984 from Susie Benson to Debbie Odom at Fireman's Fund. The memo pointed out that the contract price on the TEC–Bechtel contract had increased by $3,520,542, to a total price of $6,588,505. Ms. Benson asked, "Can we invoice now?????"

Mr. Zorns agreed with Ms. Benson's testimony that he viewed the price increase differently from her. She wanted to collect the additional premium in order to get a commission, but collection of the additional premium was not the first thing on his mind. Mr. Zorns testified that it is not customary to see contract prices double. Price changes that result in a premium adjustment at the end of the contract are usually insignificant compared to the price increase in the TEC–Bechtel contract.

In a memo dated October 1, 1984, Mr. Zorns asked Ms. Benson to get copies of the change orders and some financial information. He also said that American would bill the additional premium if Bechtel would pay TEC, and he asked Ms. Benson to check on it.

Ms. Benson replied in a memo dated October 3, 1984. She reported what Bruce Frazier at TEC had told her. Mr. Frazier said that he did not have all the change orders to make up the total amount and suggested that they get copies from Bechtel. Ms. Benson pointed out that requesting the change orders from Bechtel would serve another purpose also. It would alert Bechtel to expect the invoice for the additional premium.

Mr. Zorns sent another memo, dated October 10, 1984, to Ms. Benson. The memo said:

Thank you very much for your comments in response to my October 1 memo requesting copies of the change orders, as well as the year end statement.

I see no problem in waiting for all the change orders to go through and then receiving copies of these change orders from Bruce Frazier at TEC. As soon as all of these change orders are available

please request these from Mr. Frazier and forward to my attention.

As regards the December 31, 1983 fiscal year end financial statement, is this statement not ready or is it the case that TEC has simply not released it to you? It is obviously very important that we receive this fiscal 1983 year end statement, particularly in light of very considerable additional exposure on the above bond. . . .

Ms. Benson took the second paragraph as an order to wait for the change orders to go through and then get them from TEC. Mr. Zorns said that in light of their earlier memos, this was not an order. He only said that he saw no problem with waiting and getting the change orders from TEC.

Mr. Zorns testified that he did not want all the change orders so that he could calculate the additional premium. He wanted to find out how the contract price could have increased so much.

Bechtel's lawyer asked Mr. Zorns about his statement in this memo that American Insurance had "very considerable additional exposure" under the bond. Mr. Zorns' answered:

Well, within the normal structure of the bonding community . . . where it's very typical that the perceived liability under a bond follows the contract, and with the apparent $3,520,542 addition to the contract . . . it would seem that there could be additional exposure under the bond simply because the tradition in the industry is that the bond follows the contract.

American's lawyer also asked Mr. Zorns what he meant by "additional exposure." He asked, "Are you using exposure to mean exposure to loss?" Mr. Zorns answered, "The potential of exposure to loss."

American's lawyer gave Mr. Zorns an example in which the contract price increased from $1,000,000 to $1,200,000, and the surety collected the additional premium for the increase. Mr. Zorns could not say whether the surety would be liable for

$1,000,000 or $1,200,000. He said that it was a question for the claims department to answer, based on the cost of completion and other facts.

The lawyer asked Mr. Zorns if the surety's exposure to liability would increase from $1,000,000 to $1,200,000. Mr. Zorns replied that the surety's liability would not necessarily increase; the courts decide the question, not the parties.

In June, 1984, Mr. Zorns had notified Ms. Benson that Fireman's Fund would not write any new bonds for TEC until it received TEC's 1983 year-end financial statement. When he finally saw the financial statement, it convinced him that Fireman's Fund definitely would not write any more bonds for TEC. He notified Ms. Benson in his October 31, 1984 memo in which he said that Fireman's Fund was no longer interested in TEC's account.

Mr. Zorns must have reported to Mike Uptegrove in the home office of Fireman's Fund at the same time. In a letter dated November 7, 1984, Mr. Uptegrove thanked Mr. Zorns for the October 31, 1984 update on TEC. He agreed with Mr. Zorns and pointed out that TEC's account was still subject to a home office stop order dated August 2, 1984. Mr. Uptegrove's letter concluded:

> Please let me know what our outstanding bonded liability on this account is. I note that we executed a rather sizeable bond ($3,000,000) two years ago. Has this project been completed? Thank you.

Shortly after this, Susie Benson wrote to Barbara Duncan at Bechtel to request copies of the change orders. Ms. Benson said, "As surety for this project, we will need a copy of change order or orders showing this additional exposure under our bonds."

In his December 20, 1984 memo to Ms. Benson, Mr. Zorns told her that Fireman's Fund was not interested in consenting to change orders on TEC's account. He was referring to TEC's contracts that American had bonded before October 31, 1984. He probably meant that American Insurance would not consent to any changes in the TEC–Bechtel contract. Mr. Zorns was not concerned with whether Fireman's Fund had the legal right to refuse consent. He meant that Fireman's Fund would not consent if asked.

In a memo dated January 30, 1985, Mr. Zorns reported again to Mike Uptegrove in the home office. He reported that TEC was not likely to continue in business without money from Fireman's Fund, but he recommended against lending TEC any money as "foolhardy." With regard to the bonds, Mr. Zorns said:

> Our position regarding exposure has not yet been clarified, however, our options are that a contract technically might not exist between the principal and obligee, a valid bond might not exist on the two projects, or in the alternative we may have extremely significant exposure commensurate with the revised contract prices of $7 million dollars to $8 million dollars.

This memo also included a report on a different job that American had bonded for TEC.

Ms. Benson and Mr. Zorns were directly involved in the transactions between TEC and American Insurance. The later witnesses were called as experts in the surety business. Before going to their testimony, however, the court has to deal some more with the word "exposure" as in "exposure to liability." It came up in 1982 when American Insurance had to make the underwriting decision to issue the bonds. The court is concerned with two exhibits going back to that time.

The first exhibit is a memo from Mr. Zorns to Mr. Uptegrove. Mr. Zorns said that his main underwriting problem was figuring out exactly what TEC did.

> TEC actually constructs or manufactures less than 10% of the finished items you see in the enclosed brochures. They make and paint the cabinets and face plates for the various instruments. They connect the various components (wiring) and will design and manufacture certain electrical circuit boards needed to integrate the various components. Ninety percent of what you see in the brochures

are vendor items purchased in the outside market place.

To better understand the performance exposure we are looking at, I asked M & M and Mr. Brenner of TEC what their Product Liability exposure was. Their answer was they carry the minimums required by law—the exposure is extremely minimal. . . . From their answer and after understanding how little they really contribute to the technical assembly of the final physical product, I believe our performance exposure is somewhere between that of a Supply guarantor and a manufacturing type of exposure. . . .

The other exhibit is the handwritten notes of Mike Uptegrove. The court needs to quote only a few of Mr. Uptegrove's notes:

90% of components of their products are *standard* vendor items.

Branch does not believe we have any "performance" exposure problems.—I think individual contracts must be checked.

The key to the account is individual analysis of *each* contract to be bonded. I am willing to handle this account on a job by job basis only. Each contract must be examined to make sure there are no onerous conditions particularly in the warranty portion.

The court turns now to the testimony by the expert witnesses. The expert witnesses were all qualified as experts in the surety bond business. The court has put some of the details of their qualifications in an appendix that is also part of the court's findings of fact.

Bechtel called Edgar Richard Brannan as its only expert witness. Mr. Brannan spent close to twenty years working for surety companies. He was an underwriter for a few years, but he moved up to become a branch manager and a regional bond manager and a corporate officer in one surety company. For about ten years before his retirement, he worked for a national insurance agency, Marsh & McLennan. He used his underwriting experience to advise Marsh & McLennan's agents on how to convince surety companies to issue bonds for their clients.

Mr. Brannan testified that the penal sum is a dollar amount entered on the face of the bond when the bond is issued and is set with reference to the original contract price. The penal sum increases as the contract price increases because the bond follows the contract. The penal sum increases without the surety's consent. Furthermore, this view that the penal sum automatically increases with the contract price is widely held in the surety industry.

Mr. Brannan's testimony bears quoting:

Answer: The penal sum is entered at the origination of the bond in reference to the total contract price as known at the time the two documents are executed. You have to read both documents as consistent; and if the contract calls for performance as an obligation of the contract and if the bond, as in this case, reads that the seller will perform and fulfill all the undertakings, that would indicate to me that the penal sum would follow as a principle that my experience has taught me the bond would follow the contract and if the contract increases, so then would the penal sum.

Question: Upon what do you base that statement or observation?

Answer: My experience and understandings of the workings of bonds and contacts. It's been my understanding that the performance bond and the contract are consistent, that you read them as one document, that if there is an inconsistency in the reading of the contract and the bonds, it should be so stated in the bond, that it is not following or what parts of the bond do not follow the contract.

Mr. Brannan also described the bond as guaranteeing performance of the contract by the seller, TEC.

Mr. Brannan was asked how a surety protects itself from unlimited exposure in light of the automatic increase in the penal sum as the contract price goes up. He gave three methods of protection. Careful underwriting was one; the surety should

know the amount of change to expect in the particular kind of contract. Exceptions in the bond was another; the surety can put in the bond what it will not cover. Finally, the surety is protected by the cardinal change defense.

Mr. Brannan testified that the automatic increase in the penal sum has not always been the industry practice. The earlier practice was for the contractor to ask for the surety's consent to an increase. When the surety was asked to consent to an increase, the surety had to evaluate the risk by considering the contractor's ability to perform and other underwriting concerns. Underwriting is still relevant to an increase in the penal sum, but sureties allow the penal sum to increase automatically.

Mr. Brannan explained this practice on the ground of expedience. In development-type projects there were a large number of change orders. The sureties faced a paper storm of acknowledgement and consent forms. Sureties developed the practice of ignoring the forms.

As best as Mr. Brannan could remember, this change of practice happened, or he realized that it existed, when he was with Continental Insurance. He worked for Continental from sometime in 1978 to sometime in 1980.

Mr. Brannan admitted that the old procedure or a similar procedure has been followed in recent contracts between Bechtel and Martin–Marietta. Martin–Marietta uses a form that gives the surety's consent to the change and increases the penal sum of the bond. Martin–Marietta doesn't ask for the increase; it submits the form and the surety signs it. This makes the form a rider to the bond that increases the penal sum.

Mr. Brannan described this practice as going back to the days of consents of surety, particularly on government contracts. He pointed out that the Martin–Marietta contracts were with NASA and involved a good bit of federal government money. He also said it is still a good practice, but he did not say that it is the general practice.

Mr. Brannan testified that he had talked to colleagues in the surety business about the change in practice and that any competent bond person would give the same answer. However, he could not give the name of any living person he remembered discussing the new practice with. He also could not remember any written articles dealing with the subject.

American Insurance's lawyer gave Mr. Brannan an example in which change orders increased the contract price from $3,000,000 to $5,000,000, and the surety did not execute a written consent to an increase in the penal sum. The lawyer asked Mr. Brannan if the surety was bound at $5,000,000 instead of $3,000,000. Mr. Brannan answered that the surety was bound at the higher amount unless the changes released it under the cardinal change defense.

> Question: Are you saying that the industry standard is to increase the penal sum of the bond as the contract price increases but only if that increase is a reasonable one? ...
>
> Answer: Reasonable to the contract at hand. Both documents have to be read together. You can't read the bond and not incorporate the conditions of the contract.

This answer provoked a long exchange over Mr. Brannan's earlier testimony. Mr. Brannan admitted that he had not examined the TEC–Bechtel contract to see if the changes were reasonable. American's lawyer didn't see how Mr. Brannan could conclude that the penal sum of American's bond increased without knowing if the changes were reasonable.

This is easily explained. Bechtel's lawyer asked Mr. Brannan to assume that the changes did not release American Insurance under the cardinal change defense. When Mr. Brannan assumed that the changes did not release American Insurance, he also assumed that they were reasonable to the contract. If they were not reasonable, they were a cardinal change and released American.

Mr. Brannan went on to explain that his testimony was a statement of industry

practice. He did not say that the penal sum of American's bond increased with the contract changes. He only said that the penal sum generally increases with the contract price, provided the changes are reasonable to the contract.

Finally, Mr. Brannan testified that he did not know of any case in which the surety had paid out more than the original penal sum of the bond or had collected more from an indemnitor.

American's first expert witness was Floyd White. Mr. White has been employed by Fireman's Fund for 28 years. He has spent 19 of those 28 years dealing with surety bonds. For the past six years he has been the senior vice-president for surety claims and underwriting.

He has never heard of a custom of the trade that the penal sum automatically increases with the contract price. He has never heard it discussed at any of the meetings he has attended.

The normal practice in the surety industry is that the penal sum does not automatically increase with the contract price. The bond follows the contract, but the bond has its own terms and conditions independent of the contract; one of these is the penal sum limit.

He has heard people in low-level training classes say that the penal sum goes up with the contract price, but Fireman's Fund does not teach this. In basic textbooks and in the company manual, Fireman's Fund teaches that the penal sum can be increased only with the surety's written agreement because a suretyship contract is subject to the statute of frauds. The surety's consent to an increase in the contract price does not necessarily increase the penal sum limit.

To preserve the cardinal change defense, the surety may hesitate to collect the additional premium for an increase in the contract price. The surety runs the risk that collection of the additional premium will be treated as consent to the contract change and will prevent it from using the change to support the cardinal change defense. Mr. White could not think of any other reason for a surety to forgo collecting the additional premium.

The surety can give its written consent or agreement to an increase in the penal sum. In contracts with federal agencies, the threshold is $50,000. Apparently, this means the agency will ask for a written increase in the penal sum when the contract amount goes up by $50,000.

If the surety has already collected the additional premium for the increase in the contract price, the surety does not charge any more premium to increase the penal sum to match the contract price. The surety must consider the underwriting facts and decide whether it wants to accept the additional exposure resulting from the increase in the penal sum.

According to Mr. White, the penal sum must be the upper limit of the surety's liability in order to avoid economic problems. The board of directors is not likely to put capital into the surety company if its potential liabilities are not fixed. The surety will be unable to share the risk through reinsurance if the other sureties do not know the upper limit of liability under the bond. Indemnitors, especially third-party indemnitors, rely on the surety to weigh the risk for them. The surety has a duty to indemnitors to use its underwriting skills to limit their exposure to loss.

In questioning Mr. White, Bechtel's lawyer apparently was trying to make two points—first, that the cardinal change defense mitigates these economic problems, and second, that sureties can use other methods to prevent the economic problems.

With respect to the cardinal change defense, Mr. White testified that a 10% to 15% price overrun on a contract to overlay a concrete driveway would be typical of such contracts and would not necessarily make the surety raise the cardinal change defense. The increase in the contract price is only one measure of whether there has been a cardinal change. However, in some cases, Fireman's Fund has argued that a particular percentage increase in the contract price was proof of a cardinal change.

Bechtel's lawyer asked Mr. White if the cardinal change defense did not mitigate

the economic problems that Mr. White predicted. Mr. White answered that cardinal change defense and the penal sum are two different things. The penal sum is fixed and may or may not be affected by changes in the contract. The cardinal change defense is a win or lose defense; the surety is either released or not as the result of changes in the contract.

Bechtel's lawyer also showed Mr. White a bond clause used by another company. The surety waived notice of minor and routine changes but limited its consent to changes that did not add 15% or more to the original contract price. Mr. White said that a surety can protect itself from open-ended liability by limiting its consent to changes in the contract. He had seen similar limited consent clauses and was sure Fireman's Fund had used similar clauses.

Bechtel's lawyer asked Mr. White whether a clause like this would avoid the economic problems that Mr. White said would result from allowing the penal sum to increase automatically. Mr. White answered that this clause would not prevent the problems he pointed out. The surety still would not have control over the amount of its liabilities. The surety still would not know the upper limit of its liabilities.

American's next expert witness was Ray Britt. After obtaining his law degree in 1949, Mr. Britt went to work for United States Fidelity & Guaranty Company (USF & G). He was a claims adjuster before he took a job at the home office in the fidelity and surety claims division. He was superintendent of that division from 1969 until his retirement in 1987. He was involved with several business or professional committees for about the same length of time. He was on the committee that drafted American Institute of Architects Form 312; Forms 312 and 311 are standard forms for contractors' bonds.

Mr. Britt testified that if the owner wants the contractor to increase its bond coverage, then the contractor can obtain another bond or can obtain an increase in the penal sum of the bond it already has.

The contractor can increase the penal sum of an existing bond only by obtaining a written modification of the bond, a rider, that increases the penal sum. Mr. Britt based this opinion on the statute of frauds. The statute of frauds provides that a promise by one person (the surety) to be responsible for the debts of another (the contractor) can be enforced against the surety only if it is in writing. Furthermore, an amendment to increase the amount of the surety's potential debt must also be in writing; Mr. Britt based this conclusion on the statute of frauds and cases interpreting it.

Mr. Britt did not know of any custom under which the penal sum increases automatically with changes in the contract price. However, he has heard underwriters say that the penal sum automatically increases as the contract price goes up. He has heard this while working claims and also at USF & G's in-house seminars.

The USF & G underwriters at the in-house seminars were at various levels in the company. Mr. Britt was teaching at the in-house seminars. When underwriters stated the view that the penal sum automatically increases with the contract price, he made it very clear that they were wrong. He pointed out that the penal sum can be changed only by a written agreement.

The underwriters who expressed the opinion that the penal sum automatically increases with the contract price always based their opinion on the additional premium charged for the increase in the contract price. Other than this reasoning, Mr. Britt did not know where they got their opinion. He did not know whether it came from discussions inside or outside USF & G. In any event, he never heard competent underwriters say that the penal sum automatically increases with the contract price.

Finally, Mr. Britt testified that the federal government is the biggest customer of the surety business and that he is familiar with the government practice of using a writing to increase the penal sum of a bond.

American's next expert witness was Thomas Delaney. He worked for the Hartford Insurance Companies from 1949 until

1983. He started as a bond trainee. He spent 25 years in the Midwest as a bond representative, a bond manager, and finally the regional bond manager in the Chicago office. He became a corporate officer in 1974. He was in charge of Hartford's bond operations nationwide. He retired in 1983 as assistant vice-president in the surety department. After his retirement he rewrote Hartford's bond underwriting manual.

Mr. Delaney denied ever having heard of a custom under which the penal sum of a contract bond increases automatically with the contract price. According to Mr. Delaney, a written consent by the surety is required to increase the penal sum.

Furthermore, the surety needs to underwrite any increase in the penal sum; in other words, the surety needs to control its exposure by determining whether it should take the added risk. The underwriting may not be as detailed as when the surety first issued the bond, but the surety must consider some of the same elements.

Mr. Delaney described some bonds as open-penalty bonds, that is, bonds with no penal sum stated. These are primarily lost instrument bonds to cover stock certificates and the like. He had never heard of an open-penalty contract bond.

Mr. Delaney described two kinds of bonds that include a penal sum, but the surety may end up spending more because it is required to perform. One is a mail carrier's star route bond. The surety actually promises to deliver the mail if the mail carrier does not. The surety must deliver the mail even if it costs more than the penal sum stated in the bond. The other kind of bond is an immigrant's bond. The surety has a duty to locate the immigrant even if it costs more than the penal sum stated in the bond.

Bechtel's lawyer asked about these bonds because of Bechtel's argument that American had a duty to perform the contract after TEC's default. Mr. Delaney described American's bond as unusual because it did not expressly give American the option of doing nothing and being liable for at most the penal sum.

Mr. Delaney said that he had never been involved in a situation where the cost to complete the contract exceeded the penal sum because of problems in finding another contractor to complete the work. Bechtel's lawyer then asked, "Mr. Delaney, am I not also correct that the issue of whether the penal sum increases with changes to the original contract, in order to cover a cost to complete that is greater than the original penal sum, is simply out of your area of expertise?"

The question does not follow from Mr. Delaney's preceding statement. The question assumes too much and mixes too many factors. Nevertheless, Mr. Delaney answered it. He answered "no" at the trial, but he had answered "yes" in an earlier deposition. In the earlier deposition Mr. Delaney said that the question would be handled by the claims department. Mr. Delaney's career has been concentrated in underwriting. The confusing nature of the question leads the court to conclude that Mr. Delaney meant two different things.

First, he is not an expert on claims and does not know whether trouble finding another contractor to complete the work commonly causes the cost of completion to exceed the penal sum. Second, he can testify about the alleged custom of automatically increasing the penal sum as the contract price increases because it involves both underwriting and claims.

American's final expert witness was Donald Spickard. Mr. Spickard worked for Safeco Insurance Company from 1949 until he retired in 1982. He is a lawyer. He spent his first ten years doing mostly trial work in the casualty and related fields, but he was also legal adviser to the surety division from 1949 to 1967. He became head of the surety claims department in 1960. In 1967 he became vice-president and general manager of the surety department, both underwriting and claims; this job covered Safeco's operations nationwide. Mr. Spickard was involved with some of the same committees and associations as Mr. Britt.

Mr. Spickard testified that the only way to change the penal sum of a bond is a written rider signed by the surety's representative. The increase will be granted only after an underwriting decision to authorize the increase.

Government contract work accounts for a substantial part of the surety bond business. The federal government uses a written form signed by the surety's representative to increase the penal sum; the form becomes a rider to the bond.

American's lawyer asked Mr. Spickard if the government's practice was an illustration of or an exception to the rule with regard to the method of increasing the penal sum. Mr. Spickard said that it was an illustration of the federal government's approach and that many states have similar procedures. He also said that "requests are made from time to time to have a bond increase in private construction, and those are always done by rider."

Mr. Spickard testified that in many years of attending meetings of the American Bar Association's fidelity and surety committee and other national organizations, he has never heard a paper presented on the subject of the penal sum automatically increasing with increases in the contract price.

Bechtel's lawyer gave Mr. Spickard an example in which the bond includes a promise by the surety to perform the contract if the contractor defaults. He asked Mr. Spickard about the surety's liability if the surety breaks its promise to perform after the contractor defaults. Mr. Spickard said that the surety is liable for no more than the penal sum. If it costs four times as much to complete the contract, that is the owner's problem.

Finally, Mr. Spickard testified that Safeco's bonds sometimes include the option to tender the penal sum in full satisfaction of Safeco's obligations.

## DISCUSSION

The court thought that Bechtel was arguing a broad custom of the trade that applies to contractors' bonds in general. After the hearing, however, Bechtel included in its proposed findings of fact and conclusions of law an argument for a narrower custom of the trade. The court begins with this narrow custom of the trade.

### The Narrow Custom of the Trade

The narrow custom of the trade supposedly applies when the bond includes a promise by the surety to complete the contract if the contractor defaults, but the bond also provides that the surety will not be liable for more than the penal sum. Is the penal sum the most the surety can be liable for if it breaks its promise to complete the contract after the contractor defaults? Bechtel argues that under the narrow custom of the trade the penal sum is not the limit.

The court has already held that American did not have a duty to perform the contract after TEC defaulted. *Public Service Electric & Gas Co. v. Technology for Energy Corp. (In re Technology for Energy Corp.)*, 123 B.R. 979 (Bankr.E.D.Tenn. 1991). This decision makes the narrow custom of the trade irrelevant to American's bond—unless Bechtel wants the court to reconsider its earlier decision. This seems to be exactly what Bechtel wants.[1] Bechtel is attempting to revive its earlier argument with new evidence.

A literal interpretation of the penal sum clause may prevent this. Assume that American had a duty to perform the contract after TEC defaulted. Applied literally, the penal sum clause says that American will not be liable for more than the penal sum as damages for failure to carry out this duty. Mr. Spickard agreed with this result.

If this interpretation of the bond is correct, the narrow custom of the trade cannot apply because the bond provides for a different result. *Cramer & King Co. v. National Surety Co.*, 103 N.J.L. 83, 134 A. 771 (1926); *Zulla Steel, Inc. v. A & M Gregos, Inc.*, 415 A.2d 1183 (N.J.Super.Ct.App.Div.1980).

---

1. Bechtel's argument is not barred by the earlier decision since it is not final. *Fed.R.Bankr.Proc.* 7054 (Clark, Boardman, Callaghan, Norton Bankr.Rules Pamph.Ed.1991-92).

Bechtel argues that the penal sum clause cannot be applied this way because it would allow American to profit by its own wrongdoing. Instead of being penalized for breaking its promise to perform after TEC's default, American will save money if the penal sum is less than the cost of completing the contract.

■ The court disagrees. The parties to a contract can include a limit on the amount of damages either of them will owe for breach of the contract. The penal sum clause might be applied this way. It would limit American's liability for breaking its own contract (the bond) by refusing to perform the TEC–Bechtel contract after TEC's default. In some situations the courts will not enforce the limit in the contract, but it takes more proof to prevent enforcement than Bechtel's argument that American would profit by its own wrongdoing. *Monsen Engineering Co. v. Tami–Githens, Inc.*, 219 N.J.Super. 241, 530 A.2d 313 (App.Div.1987).

The court concludes that the bond's penal sum clause contradicts the narrow custom of the trade and prevents it from applying to American's bond.

In the alternative, the court assumes that the bond is ambiguous as Bechtel argues. This actually involves two assumptions: American had a duty to perform the contract after TEC's default, and the penal sum should not be the limit on American's liability for breach of this duty. The question is whether Bechtel proved the narrow custom.

Bechtel relies first on examples of bonds that supposedly are like American's bond and supposedly have been interpreted to agree with Bechtel's argument.

Open penalty bonds cannot support Bechtel's argument because they do not have a penal sum limit that can be in conflict with the surety's duty to perform after the contractor defaults.

Under an immigrant's bond, the surety has a duty to find the immigrant if he fails to appear. The surety may spend more than the penal sum finding the immigrant. An immigrant's bond is too different from a contractor's performance bond to support Bechtel's argument.

A star route bond is a performance bond for a private contract mail carrier. According to Mr. Delaney, a star route bond has a penal sum limit, but the surety has a duty to deliver the mail if the carrier defaults. The surety may spend more than the penal sum to get the mail delivered after the carrier defaults. Mr. Delaney did not testify that the surety will be liable for more than the penal sum if it breaks its promise to deliver the mail after the carrier's default.

There are two ways to look at Bechtel's argument. It is an attempt to prove a narrow custom of the trade, or it is simply an attempt to prove that a performance bond worded like American's bond has been interpreted to agree with Bechtel's argument. The result is the same either way.

The only bond that gives any support to Bechtel's argument is the star route bond. However, Bechtel only proved that a bond with a penal sum limit may require the surety to perform the contract after the contractor's default. Bechtel did not prove that the surety on a star route bond can be liable for more than the penal sum if it fails to perform after the contractor's default. *See Clemons v. Huckaby*, 251 Ala. 419, 37 So.2d 504 (Ala.1948). Even if Bechtel had proved this, the court cannot say that an ordinary contractor's performance bond should be interpreted the same way as a star route bond.

In custom-of-the-trade terminology, the evidence does not clearly establish the narrow custom of the trade. *Heritier v. Century Indemn. Co.*, 109 N.J.L. 313, 162 A. 573 (1932); *Public Service Mut. Ins. Co. v. White*, 4 N.J.Super. 523, 68 A.2d 278 (App. Div.1949); *Hunn v. Meade*, 119 N.J.L. 333, 196 A. 700 (1938); *Red Bank Hudson, Inc. v. Pawtucket Mut. Ins. Co.*, 36 N.J.Super. 556, 116 A.2d 650 (Law Div.1955). *See also Cramer & King Co. v. National Surety Co.*, 103 N.J.L. 83, 134 A. 771 (1926); *Runyan v. Central R. Co.*, 64 N.J.L. 67, 44 A. 985 (1899).

Furthermore, a custom of the trade cannot be proved by an isolated practice confined to a peculiar kind of bond issued for the postal service's benefit. *Leitner v. Braen*, 51 N.J.Super. 31, 143 A.2d 256 (App.Div.1958); *Kronisch v. Howard Sav. Inst.*, 154 N.J.Super. 576, 382 A.2d 64 (Ch. Div.1977) *aff'd in part, rev'd in part* 161 N.J.Super. 592, 392 A.2d 178 (App.Div. 1978).

Bechtel also relied on the testimony of its expert witness, Mr. Brannan. Mr. Brannan said that the bond follows the contract or the bond is for performance of the contract. He meant that the bond covers changes in the contract, and under a custom of the trade, the penal sum increases automatically with the contract price. Later he explained that he was testifying only about this general custom. Mr. Brannan was not singling out American's bond for different treatment on the ground that American had a duty to perform the contract if TEC defaulted.

Bechtel also needed to prove that the narrow custom was known by American or was so well-known in the business that American should be treated as having known it. Bechtel did not prove either.

Mr. Brannan testified that any competent bond manager would know the custom of the trade, but he obviously meant the broad custom of the trade alleged by Bechtel, not the narrow custom. Mr. Delaney did not give any testimony to establish that Bechtel's interpretation of a star route bond is widely known in the industry or is accepted as carrying over to ordinary contract performance bonds. None of the other expert witnesses gave any testimony to prove the existence of the narrow custom of the trade. The testimony by American's underwriter, Jim Zorns, also does not support the narrow custom of the trade.

The court stands by its earlier decision. This brings the court to the main issue, the broad custom of the trade also alleged by Bechtel.

### The Broad Custom of the Trade

Bechtel's expert witness, Mr. Brannan, testified that the broad custom of the trade came into existence when sureties stopped the practice of answering and began ignoring requests for consent to changes in the bonded contract. The court does not see a connection between the change of practice and the broad custom of the trade.

■ Whether the surety consents to changes in the contract makes a difference to the surety's cardinal change defense. A cardinal change in the contract without the surety's consent releases the surety from the bond. If the surety consents to a change, it cannot use the change to prove the cardinal change defense. On the other hand, the surety's lack of consent means that it can use the change to prove the cardinal change defense. *State v. Weissenburger*, 189 N.J.Super. 172, 459 A.2d 693 (App.Div.1983); *Lamson v. Maryland Casualty Co.*, 196 Iowa 1185, 194 N.W. 70 (1923); *People's Lumber Co. v. Gillard*, 136 Cal. 55, 68 P. 576 (1902); *House v. American Surety Co.*, 21 Tex.Civ.App. 590, 54 S.W. 303 (1899); *Village of Newark v. James F. Leary Constr. Co.*, 118 Misc. 622, 194 N.Y.S. 212 (Sup.Ct.Wayne Co. 1922).

The surety can give advance consent in the bond. The bond's consent clause may not state a limit on the surety's consent. *Compare Roberts v. Security Trust & Savings Bank*, 196 Cal. 557, 575, 238 P. 673 (1925) *and Massachusetts Bonding & Ins. Co. v. John R. Thompson Co.*, 88 F.2d 825 (8th Cir.1937). Or the bond may put a limit on the surety's consent to contract changes. The limit is usually a dollar amount or a percentage of the original contract price or penal sum. *See, e.g., Board of Education of Sault Ste. Marie v. Chaussee*, 211 Mich. 61, 177 N.W. 975 (1920); *Acoustics, Inc. v. Hanover Ins. Co.*, 118 N.J.Super. 361, 287 A.2d 482 (Law Div.1971); *Schnitzer v. Couch*, 279 S.W. 165 (Mo.Ct.App.1925).

■ If the bond and contract do not give advance consent, the surety can give its consent later by some other method. Consent generally need not be in writing to bind the surety. *Trinity Universal Ins. Co. v. Gould*, 258 F.2d 883 (10th Cir.1958); *Rutherford v. Brachman*, 40 Oh.St. 604

(Ohio 1884); Restatement of Security § 127 (1941).

Ignoring a request to consent to a contract change might amount to consent. *See Trinity Universal Ins. Co. v. Gould,* 258 F.2d 883 (10th Cir.1958); *Federal Surety Co. v. White,* 88 Colo. 238, 295 P. 281 (1930); *Hellman v. Farrelly,* 132 A.D. 151, 116 N.Y.S. 809 (1909) (acquiescence as consent).[2] But it is still just consent to the contract change. It is not consent to an increase in the penal sum unless there is some connection between them.

For Mr. Brannan's explanation to make sense—indeed, for the broad custom of the trade to make sense—there must be some connection between consent to a contract change and an increase in the penal sum. The court turns now to the question of whether there was a link between consent to a contract change and an increase in the penal sum.

Mr. Brannan did not say whether sureties generally answered consent requests even though the contract and bond gave consent to some changes. The issue makes no difference to the court's decision. The key question is still whether sureties linked consent to a contract change to an increase in the penal sum.

Did sureties follow the practice of consenting to an increase in the penal sum whenever they consented to a contract change that increased the contract price? Did they follow the practice of charging the additional premium only when they consented to both the contract change and a corresponding increase in the penal sum? If sureties followed either of these practices or some equivalent practice, then a surety's consent to a contract change might carry with it consent to an increase in the penal sum, without regard to the method of giving consent.

The evidence does not show that sureties followed any such practice. In other words, the evidence does not show that sureties linked consent to a contract change and consent to an increase in the penal sum. Without such evidence, the court does not see why the broad custom of the trade would develop from the practice by sureties of ignoring requests for consent to contract changes.

■ The statute of frauds adds to this reasoning. The statute of frauds applies to a promise by one person to answer for another person's debt, default, or miscarriage. The statute requires a writing signed by the person who made the promise; otherwise, the promise cannot be enforced. N.J.St.Ann. § 25:1–5 (West 1991).

A surety bond comes under this part of the statute of frauds. *American Cas. Co. v. Devine,* 275 Ala. 628, 157 So.2d 661 (1963); *Craswell v. Biggs,* 160 Or. 547, 86 P.2d 71 (1938); *Bonine v. Deniston,* 41 Mich. 292, 1 N.W. 1024 (1879).

■ If there is a signed writing, the statute of frauds requires that any material change must also be in writing. *Kahoot v. Gurbisz,* 101 N.J.Eq. 757, 139 A. 223 (1927); *Kerzner v. Chanin,* 98 N.J.L. 38, 118 A. 693 (1922); 72 Am.Jur.2d Statute of Frauds § 274 (1974). The question is whether an increase in the penal sum would be a material change.

What must be in writing in the first place to satisfy the statute of frauds? A promise to pay a particular debt owed by someone else must identify the debt. Identifying the debt does not require a limit on how much the surety will pay, but suppose a limit is included; the bond promises to pay the contractor's debt for damages up to $1,000,000. The bond identifies the debt as damages up to $1,000,000. The dollar limit is a key part of the surety's promise, and any increase would be a material change in the bond. Thus, the statute of frauds requires an increase in the penal sum to be evidenced by a writing signed by the surety. *See Craswell v. Biggs,* 160 Or. 547, 86 P.2d 71 (1938); *Bonine v. Deniston,* 41 Mich. 292, 1 N.W. 1024 (Mich.1879).

---

**2.** Ratification of the change or estoppel to rely on the change have the same effect as consent given beforehand.

The correctness of this result is shown by the evidence that sureties followed the practice of requiring a signed writing to increase the penal sum. Even Bechtel's expert witness, Mr. Brannan, practically agreed that sureties followed this general practice in the past.

The owner or contractor could get consent to a contract change without a writing and perhaps just by the surety's failure to object to a change when it had notice. On the other hand, the penal sum could be increased only if the surety signed a rider to the bond. When sureties adopted the practice of ignoring requests to consent to contract changes, it should not have made any difference to the method of increasing the penal sum.

This is true even if the consent forms asked for both consent to the contract change and consent to a corresponding increase in the penal sum. Ignoring the request to increase the penal sum would not suggest the surety's consent to the increase because sureties always required a signed writing.

Moreover, the court finds it hard to believe that the broad custom of the trade would ever have developed in light of the statute of frauds. The broad custom would increase the debt limit without a writing signed by the surety, even though sureties knew that the statute of frauds required a signed writing. If sureties intended to allow the penal sum to increase automatically with contract changes, they could easily have changed their bond forms to provide for it in writing. This would make more sense under the statute of frauds than adopting the broad custom of the trade.

Mr. Brannan's explanation does give superficial support to the development of the broad custom of the trade. The court assumes that sureties stopped two general practices—signing consent forms for contract changes and signing forms to increase the penal sum. These changes may have led owners and contractors to believe the broad custom exists.

But these changes could lead to exactly the opposite result from the broad custom of the trade. Sureties may have intended to adopt a general hands-off attitude toward increases in the penal sum. Sureties may have decided that they would stop the practice of routinely increasing the penal sum by signing forms consenting to increases.

Finally, in one case New Jersey's highest court denied a connection between consent to a contract change and an increase in the surety's liability. *See Town of Guttenberg v. Vassel*, 74 N.J.L. 553, 65 A. 994 (1907).

In summary, Bechtel has not proved any good historical basis for the broad custom of the trade. This conclusion does not necessarily settle the question of whether the broad custom of the trade exists. It may exist without having grown naturally or logically out of the practices followed by sureties.

American argues that, without regard to history, the broad custom cannot exist now because it would be contrary to the statute of frauds. Bechtel argues that an increase in the penal sum under the broad custom of the trade is not a change in the bond and therefore the statute of frauds does not apply. Theoretically, the increase is not a change because the broad custom was part of the bond when it was written.[3]

■ The New Jersey courts allow a contract to be explained by a custom of the trade even if the contract is not ambiguous. This is an exception to the parol evidence rule. *Cramer & King Co. v. National Surety Co.*, 103 N.J.L. 83, 134 A. 771 (1926).

The statute of frauds is a separate barrier. It generally allows proof of a custom of the trade only to clear up an ambiguity in a bond, not to vary unambiguous terms. *Frank H. Childs, Handbook of the Law of Suretyship and Guaranty*, § 87 (West 1907). The broad custom would violate this rule. It would make a material change in the penal sum clause without a signed writ-

---

**3.** This reasoning also applies to the argument that the broad custom of the trade cannot apply

because it contradicts the plain language of the bond.

ing and even though the penal sum clause is not ambiguous.

The court agrees with American. When the wording of the bond is not ambiguous, the penal sum cannot be automatically increased by the broad custom of the trade because it would violate the statute of frauds.

American also argued that the broad custom cannot exist because a surety would not have control over its potential debts and this would cause serious business problems.

Bechtel argued that sureties use limited consent clauses to prevent the broad custom from applying. The court does not agree. As far as the court can tell, sureties use limited consent clauses only to preserve or define the cardinal change defense, not to prevent penal sum increases under the broad custom of the trade.

Bechtel also argued that careful underwriting and the cardinal change defense protect sureties from the business problems that supposedly would result from the broad custom. A careful underwriter can estimate how much price increase to expect in the contract. Likewise, the surety can estimate the total price increase up to the point of a cardinal change that will release the surety. These estimates it can be used to avoid the economic problems that Mr. White predicted.

The question is whether sureties are operating this way now. Are sureties operating as if the broad custom of the trade exists or does not exist?

The broad custom would be considered in setting premium rates. The broad custom would also be relevant to American's accountants when they calculate its total potential debts. There was no direct evidence on either point.

However, Mr. White in effect testified for American that sureties are not operating as if the broad custom of the trade exists; they are still using the penal sum to estimate their liabilities as if the broad custom does not exist.

The court accepts Mr. White's version of how sureties operate. Mr. White is still involved in the business whereas Mr. Brannan has not worked for a surety company for more than ten years. Furthermore, all other expert witnesses (except one) testified that the broad custom of the trade does not exist. The court concludes that sureties are not operating now as if the broad custom exists.

This means, or at least strongly implies, that the broad custom does not exist. It also undercuts any argument by Bechtel that the broad custom was so well known in the business that American should be treated as having known it. *Cramer & King Co. v. National Surety Co.*, 103 N.J.L. 83, 134 A. 771 (1926).

This brings the court to the testimony directly on the question of whether the broad custom exists.

Ms. Benson testified for Bechtel that in her experience the penal sum means the contract price, including increases caused by contract changes. She testified that this is the way contractors' bonds have always been done in her experience.

American's underwriter, Mr. Zorns, made a number of statements about exposure to liability. However, he did not give a good explanation of what he meant. Exposure to liability and similar terms can mean the maximum dollar amount the surety may owe, or the odds that the surety will be liable for anything or for some amount less than the maximum. Thus, Mr. Zorns' statements about exposure to liability are unclear.

The important point about Mr. Zorns' testimony is what he did not say. He never mentioned the penal sum of the bond as the maximum that American could be liable for.

Mr. Zorns was also asked about how sureties usually operate instead of what happened with this particular bond. He never said directly that the penal sum is the maximum a surety can be liable for without regard to how much the parties increase the contract price. He seems to have thought of no defense other than the cardinal change defense.

Mr. Uptegrove's notes and memos to Mr. Zorns also did not mention the penal sum

as the limit on American's liability. Mr. Uptegrove mentioned "performance exposure" but that does not necessarily mean the total amount that American might be liable for. Mr. Uptegrove referred to TEC's $3,000,000 bond and asked for the total bonded liability on TEC's account. But TEC's "account" meant all the bonds issued for TEC, not just the $3,000,000 bond on the TEC–Bechtel contract.

Bechtel argues that Mr. Zorns' failure to mention the penal sum should have provoked a reply from Mr. Uptegrove pointing out that the penal sum was the limit of American's liability. Mr. Uptegrove's failure to do this barely qualifies as evidence that he did not treat the penal sum as the limit of American's liability. Certainly it is less convincing than Mr. Zorns' silence with regard to the penal sum.

On the other hand, American's expert witnesses all testified that the contractor needs the surety's written consent to increase the penal sum of a bond. They all disagreed with Mr. Brannan's testimony that sureties have dropped this practice and replaced it with the broad custom of the trade. Furthermore, Mr. Brannan did not recall any situation in which a surety paid the owner more than the penal sum stated in the bond or collected more from an indemnitor.

The court can understand why American would not want to prove that many people in the bonding business believe the penal sum increases automatically as Bechtel argues. But the evidence suggests that this is a common misunderstanding of the law by people regularly involved with contractors' bonds.

American's expert witnesses in effect denied having heard Bechtel's argument described as a custom of the trade. Mr. White and Mr. Britt admitted that they had heard employees of surety companies say that the penal sum increases automatically with the contract price.

The basic, common facts certainly give the impression that the penal sum increases automatically with the contract price. The penal sum usually equals the original contract price. When the owner and con-

tractor make changes in the contract that increase the contract price, the surety charges an additional premium. This makes the bond look like an insurance policy with the penal sum as the limit of liability. The owner or contractor pays more premium for more coverage, that is, for an increase in the liability limit known as the penal sum.

When a kind of transaction is done one way over and over, the parties may get the impression that the law is different from what the law really is. They may even overlook other common transactions that disagree with their impression of the law. Sureties issue contractors' bonds with the penal sum less than the original contract price. Suppose the penal sum is 50% of the original contract price. The premium is the same as if the penal sum were 100% of the original contract price because the premium is charged on the contract price. Likewise, when the contract price goes up, the surety collects an additional premium on the entire increase.

Would the broad custom of the trade apply to a bond with a 50% penal sum, or how would it apply? Would the penal sum automatically increase 50% of the increase in the contract price? No one asked Mr. Brannan, Ms. Benson, or Mr. Zorns any questions that might have shed some light on this point.

The court believes that the broad custom of the trade alleged by Bechtel is not a custom of the trade at all but a common misunderstanding of the law.

For Bechtel to prevail, the evidence must clearly establish the custom of the trade. Furthermore, Bechtel must prove that when American issued the bond, the custom was known to American or was so well known in the business that American should be treated as having known it. *Heritier v. Century Indemn. Co.*, 109 N.J.L. 313, 162 A. 573 (1932); *Public Service Mut. Ins. Co. v. White*, 4 N.J.Super. 523, 68 A.2d 278 (App.Div.1949); *Hunn v. Meade*, 119 N.J.L. 333, 196 A. 700 (1938); *Red Bank Hudson, Inc. v. Pawtucket Mut. Ins. Co.*, 36 N.J.Super. 556, 116 A.2d 650 (Law Div.1955). *See also Cramer & King Co. v. National Surety Co.*, 103 N.J.L. 83,

134 A. 771 (1926); *Runyan v. Central R. Co.*, 64 N.J.L. 67, 44 A. 985 (1899).

Bechtel's evidence fails on both points. The evidence does not clearly establish the broad custom of the trade. The evidence also does not prove that the broad custom was known to American or was so well known in the business that American should be treated as having known it. This is true without regard to whether the broad custom of the trade is really a common misunderstanding of the law.

■ The court concludes that no custom of the trade under New Jersey law made the penal sums of American's bonds increase as the contract prices increased. The court will enter an order.

This memorandum, including the appendix, constitutes findings of fact and conclusions of law as required by *Fed.R.Bankr. Proc. 7052.*

## APPENDIX

### Mr. Brannan

Mr. Brannan was a bond underwriter for Glen Falls Insurance Company in its San Francisco office, a branch manager in San Jose, and then the bond manager in the Seattle regional office. In 1968 he went to work for Fireman's Fund. He was the branch bond manager in Albuquerque, New Mexico, Des Moines, Iowa, and Davenport, Iowa. In 1971 he returned to California and went to work for Great American Insurance Company as the regional bond manager in the San Francisco office. He worked there until 1974 when he went to work for Employer's Insurance of Wausau in its San Francisco office. He organized the bond operations for the Pacific Coast, including Los Angeles, Seattle, Alaska, Hawaii—the entire western region. In 1978 he went to work for Continental Insurance as the West Coast bond officer in charge of the Pacific region. He was also secretary of the corporation. He left Continental in 1980 as the result of a corporate shake-up in which the people who had employed him left Continental. When he left Continental in 1980, he went to work for Marsh & McLennan. Mr. Brannan has attended or taught in numerous seminars on the surety bond business. Since his retirement he has served as a consultant in several lawsuits such as this one.

### Mr. White

Mr. White graduated from college and served two years in the army before going to work for Continental Insurance in 1957. He was a bond trainee and then a bond underwriter in Continental's San Francisco office until he went to work for Fireman's Fund in 1962. He served as a regional vice-president for Fireman's Fund from 1983 to 1985 in Louisville, Kentucky. In 1985 he returned to the San Francisco office and took his present job. Mr. White has regularly attended national and regional meetings of the National Association of Surety Bond Producers. He has attended at least four such meetings per year since 1986.

### Mr. Britt

While Mr. Britt was superintendent of the fidelity and surety claims division, he was USF & G's representative on the claims advisory committee or the Surety Association of America. He had begun attending the committee's meetings two years earlier. From 1967 to 1990 he also attended meetings of the fidelity and surety committee of the American Bar Association's Torts and Insurance Practice Section. American Institute of Architects Form 312 was supposed to replace Form 311, but both forms are now used. Finally, Mr. Britt was hired by the Insurance Institute of America to write two chapters in a set of books that are intended to be a training course for people in the fidelity and surety bond business.

### Mr. Delaney

Mr. Delaney graduated from college and spent three years in the navy before going to work for Hartford. He started at the home office as a bond trainee. The Chicago region included ten states. While he was a corporate officer, Mr. Delaney attended the yearly national meeting of the National Association of Surety Bond Producers. He also attended one regional meeting per year. He was a member of the fidelity and surety committee of the American Insurance Association, and in 1982 and 1983 was chairman of the commit-

tee. The committee members were all from the major surety companies. Since his retirement, Mr. Delaney has worked as a consultant to several law firms around the country in matters such as this.

Mr. Spickard

In 1963 Mr. Spickard became assistant vice-president. Safeco is a member of the executive committee of the Surety Association of America. Mr. Spickard was Safeco's representative on the executive committee from 1972 until his retirement in 1982. The Surety Association makes rates and forms and serves as an advisory trade association for the surety industry, including nearly all the companies that write any significant surety business in the United States. The association also advises the federal government and several state governments.

Beginning in 1960, Mr. Spickard was involved with the fidelity and surety committee of the American Bar Association's Torts and Insurance Practice Section. He was vice-chairman from 1968 through 1983 or 1984.

Mr. Spickard has given a number of talks to different groups affected by surety bonds in the construction field and has assisted in training underwriters in the Safeco group. He has spoken at meetings of the Associated General Contractors on problems in obtaining bonds and the requirements of underwriters. Mr. Spickard has spoken at two national and several regional meetings of the National Association of Surety Bond Producers.